The objection to the form of the issues cannot be sustained. The only question involved is the right of the defendants to deduct the sum due on the loan note 21 September, 1912, from the $5,000 admitted to be due on the policy on that the date of its maturity. *Page 436 
The plaintiff had opportunity, under the issues as submitted, to present any pertinent evidence. The form of the issues is of little consequence if the material facts at issue are clearly presented by them. Paper Co. v.Chronicle Co., 115 N.C. 147; Patton v. Garrett, 116 N.C. 847.
There is nothing upon which to base a plea of the statute of limitations, for the policy matured 21 September, 1912, and, by the express words of the note, the defendants were authorized on that date to deduct from the money then due on the policy a sufficient sum to pay the note.
The court properly placed the burden of proof upon the first issue on the plaintiff. The execution of the policy, of the application therefor, and of the loan note were admitted and the papers themselves introduced in evidence by the plaintiff. The loan note appears upon its face to be made "for value received." This recital imports a consideration, and isprima facie evidence thereof, whether the note is negotiable or not, and the same is true of words of equivalent import. 8 Cyc., 225, That an unsealed note which recites to be for value received furnishes proofprima facie of a consideration to support it is the adjudication of this Court in Stronach v. Bledsoe, 85 N.C. 474. As the note itself bears evidence that it was made upon valuable consideration, the court properly refused the plaintiff's prayer and put the burden on plaintiff to show a want of consideration. Stronach v. Bledsoe, 85 N.C. at page 476; I Daniel Neg. Inst., sec. 161.
(372) But, apart from all this, the judge might well have instructed the jury that there is no evidence to rebut the prima facie case of consideration made out by the instrument itself. All the evidence in this record was introduced by the plaintiff and shows the transaction between the parties to be about as follows:
The insured, H. C. Cowles, held a policy, No. 79030, issued by defendant some time previous to 28 April, 1903, at which date he and his wife made written application to defendant to exchange it for a twenty-year endowment bond 910 policy with annual premiums of $376.05, and expressly asked that the new policy be dated 21 September, 1892, so as to fall due 21 September, 1912, if Cowles lived so long.
The great difference in value between the old policy and the new is well described in the evidence. The old policy was a term policy insuring the life of Cowles for one year at a time with the privilege of renewal for each succeeding year at a higher and constantly increasing rate of premium. It had neither cash surrender value, paid up nor extended insurance values; and must be carried until death to have any value whatsoever, and was limited in amount to five thousand dollars. It was in evidence that the premium upon this policy would have, before the death of Cowles, reached a very large sum, probably eight hundred dollars a year. *Page 437 
The new policy was almost the exact opposite of the first. Instead of having to be carried to death, it was so framed as to mature less than ten years from its issue, or twenty from its date, and be payable during the life of Cowles if he lived longer than the endowment period, which expired 21 September, 1912. Unlike the old policy, it had cash surrender, loan, paid up and extended insurance values, all of which are set out in the table on the third page of the policy. It had also in addition to the amount of five thousand dollars absolutely guaranteed, a term feature, by which additional protection was given to the beneficiary had the insured died before the maturity of the policy. Thus, while the policy was issued in 1903, it had immediately a loan value of twenty-four hundred and ninety dollars and a paid up endowment value of twenty-six hundred and thirty dollars; and a death benefit, had death occurred during that year, of seventy-two hundred and twenty-five dollars. These amounts all increased; and during the year ending 21 September, 1911, or the year before the maturity of the policy, it had a loan value of five thousand dollars, a death benefit value of ninety-six hundred and forty-five dollars, and a paid up endowment insurance value of forty-seven hundred and thirty-five dollars. The next year the policy matured; and during that year, or the year of maturity, these values had so increased that, had the assured died during the year ending 21 September, 1912, the beneficiary would have received five thousand dollars endowment, and, in addition thereto, five thousand dollars more under the term insurance feature. The witness (373) Conklin was asked: "Had Col. Cowles died the last year he was paying premiums, what would his beneficiary have received under the new policy?" To which he answered: "She would receive ten thousand dollars, less the indebtedness."
Besides this, the new policy was predated more than ten years by agreement between the assured and beneficiary on one side and the society on the other; and by reason of such predating had immediate and larger values than it would have acquired without such predating; and it required only ten payments, one of which was made cash at the time, to mature the policy, instead of twenty had it been dated on the day it was issued, instead of being dated ten years prior thereto.
By the predating of the policy the assured got the benefit of a premium based upon his age in 1892, fifty years, instead of sixty years, his age in 1903; and the rate of premium paid by him was consequently much less than if his policy had been dated in 1903. Assured had all the benefit in values, loan, rate of premium, protection of legal reserve, etc., under the policy delivered him in 1903 that he would have had under a similar policy actually delivered to him 21 September, 1912. The new policy required only ten premiums — less in case of earlier death — *Page 438 
while the old one required payments during life. These appear to be substantial and material values, inherent to the new policy, which did not appertain to the old one, and amply supported the consideration for the note.
The great difference in the value of the two policies is apparent even to one not versed in the intricacies of life insurance. Dating the new policy back ten years made the fixed annual premium much less, and made it mature as to its endowment ten years earlier. The ten years back premiums had to be paid. For making the exchange of policies, Cowles contracted to pay $2,915.30, as shown by the following extract from application:
It is also understood and agreed that the assured pay to the Provident Savings Life Assurance Society of New York at or before the delivery, of the policy hereby applied for, the sum of twenty-nine hundred and fifteen and 20/100 dollars, and in consideration thereof at the time of the delivery of the policy hereby applied for the Provident Savings Life Assurance Society of New York agrees to loan to the assured the sum of twenty-five hundred and thirty nine and 25/100 dollars ($2,539.25/100) upon the security of said policy, and the said amount shall be a lien upon said policy when issued until the same shall be paid.
And it is also understood and agreed that the assured is hereby authorized to sign a collateral note to secure the repayment of said sum in the form in use by said society.
(374) It is further understood and agreed that all statements and warranties upon which the validity of said policy No. 79030 is conditioned are hereby renewed as to the date when made, and are hereby made a part of the contract under the policy hereby applied for, and of the consideration therefor.
Dated at Statesville, 28 April, 1903.
 HENRY C. COWLES. JULIET M. COWLES.
It is quite certain that the defendant would not swap policies with Cowles without charging him "boot." There was entirely too great a difference in the intrinsic value of the two policies, especially as the new one was dated back ten years and the premium fixed at a date when Cowles was ten years younger than he was at date of his application. The difference which Cowles agreed to pay, as shown by the written application, was $2,915.30. He executed this note for $2,539.25 at five per cent interest and paid balance in cash. It is perfectly patent that the consideration for the note was the exchange of policies. The cash payment which Cowles made of $376.05 was evidently for the premium *Page 439 
on the new policy for the ensuing year, which must be paid in cash in advance.
The note represented the difference between the premiums which the assured paid upon his old policy from 21 September, 1892. The amount of the note differs very slightly from the reserve required to be kept on this policy had it been issued in 1892, and very slightly from the loan value which such a policy, issued in 1892, would have had in 1903, according to the testimony of the witness Hubbard.
Plaintiff contended that the note was illegal because its effect, if legal, would be to reduce the amount of insurance available to the beneficiary to a sum less than the guaranteed amount of five thousand dollars. When the policy was delivered the amount payable at death was seventy-two hundred and twenty-five dollars, less twenty-five hundred thirty-nine and 25/100 dollars, the amount of the note, slightly below the five thousand dollars guaranteed.
This objection seems to be without force; and no authority was cited to sustain it, and we have found none. In principle we do not think the objection well founded, for to give it effect would be to very seriously hamper the borrowing privilege of the assured, which privilege sometimes may prove very valuable. The unavoidable effect of any loan against a policy is to reduce the amount payable under the policy; and, if the loan be made during the early life of the policy, it will ordinarily reduce the value of the policy below the guaranteed amount. If a considerable loan be made, as was the case in this instance, contemporaneously with the issue of the policy, almost of necessity the amount available after the payment of the loan will be less than the face of the policy.
The unprofitableness of this contract to the insured, urged by (375) counsel so earnestly, is a matter which should not influence us. Had the insured died before the maturity of the policy, it would have turned out very differently for the beneficiary. But, however it may finally result, insurance is a contract; and, when a contract is admitted, the Court can no more change its terms than it can the terms of any other contract. The Court cannot, after the maturity of the policy by death or by any other cause, look back to the beginning and say that this policy, having been proven unprofitable to the assured, should be changed so as to make it profitable. Any such construction of a policy would destroy the business of insurance and make it impossible. The courts, instead of interpreting, would be making a contract after all mutuality between the parties to the contract had ceased.
We do not find in our own reports a case analogous to the one at bar, and none were cited to us in the argument. We find in the courts of sister States cases similar and some almost analogous. In McIntyre v. *Page 440 Ins. Co., 82 Georgia, 478, Chief Justice Bleckley discusses learnedly a suit brought on a fifteen-year endowment policy, in which the insured objected to a deduction from the endowment fund of interest which had accrued on notes which he had given for one-half of the premium. He contended that the interest on these notes, at least, should be deducted entirely from the profits of the company, it being to some extent a mutual company; and that in no event should the interest on these premium notes be deducted from the principal of the endowment, because that would be to reduce the amount of the guaranteed endowment. The Court held to the contrary; and the principal of the notes given for part of the premiums, together with interest thereon until the end of the endowment period, were deducted from the face of the endowment, leaving so small an amount that plaintiff was dissatisfied and brought suit.
Whether a policy loan was without consideration, was against public policy, or was a discrimination is discussed in Life Ins. Co. v. Woods, 11 Indiana App., 338. The Court said:
"We see no valid reason why an insurance company and an applicant for life insurance may not enter into a binding agreement to the effect that the company will undertake to loan the insured a sum of money, as well as to insure his life, and that the money loaned is to be deducted from the proceeds of the policy at the time of the maturity thereof. Such a contract is not in violation of the principle of indemnity upon which insurance is generally based, for the money may be needed for the payment of premiums and other purposes to enable the insured to secure the full benefit of such insurance. Hence, if the contract in suit had provided in terms for a loan of money, and the repayment of the same out of the proceeds of the insurance, that having such a provision would be binding upon all parties, although the policy be written (376) for the sole benefit of the wife. It is true that in ordinary life insurance, where the wife of the insured is the beneficiary, the title of the policy vests in her immediately upon execution and delivery thereof, and no arrangement between the company and the insured affecting the interest of the wife in the insurance money, which is not provided for by the terms of the policy itself, will be binding upon her."
In Life Assurance Society v. Dunkin, 1st Tenn. Chancery App., page 562, the Court said that "where the husband gives a loan certificate to the insurance company as part of the first premium paid by him, his beneficiary, his wife, will not, after his death, be allowed to repudiate the note and claim the face of the policy."
Hay v. Ins. Co., 101 N.E. 651, from Indiana, is a case very similar to the one at bar. In that case the insurance policy was predated seven years, a loan agreement executed, note given and an agreement that the indebtedness was to be a lien on the policy. The Court held that the loan *Page 441 
agreement was binding on the beneficiary, even though executed without her knowledge or consent.
It is a general principle of the law of contracts that two or more instruments executed contemporaneously, by the same parties in reference to the same subject-matter, constitute one contract. Therefore, the policy and note must be taken as one transaction and construed together. According to their terms the beneficiary would receive stipulated sums, varying in amount, if insured died before the end of the endowment or accumulation period. If he outlived that period she would only receive $5,000. Whether the insured died before or after that period a sum sufficient to pay the note was to be retained by defendant out of the sum due on the policy.
It was suggested on argument that Cowles may have paid the $2,915.30 in cash. If so, then why did he give the note, the execution of which is admitted? There is no evidence that he paid anything more than $376.05 in cash, and that was for the premium on the new policy for ensuing year. Deduct that from $2,915.30 and we have left the sum of $2,539.25, the principal of the note. There is no plea of payment set up against the note, and not a scintilla of evidence that any part of it has ever been paid.
It was admitted that the collateral loan note and agreement were in the possession of the defendants at the time of trial, and there was no denial of the rightfulness of their possession. There was no claim that plaintiff or her husband had ever had possession of the note or application after the execution of the same, more than ten years before the death of insured. The note or loan agreement and application were both offered on the trial and put in evidence by the plaintiff; but, before offering them, plaintiff requested the defendants to furnish them, which was done.
Upon the consideration of all the evidence we find nothing that (377) warrants the conclusion that this transaction is illegal, oppressive or immoral. Doubtless had the insured died prior to the end of the endowment period a very different result would have followed, and no such charge would have been made.
The view we have taken of this case renders it unnecessary to consider the fifty assignments of error in the record except the one relating to the tender and costs.
Plaintiff objected that the court awarded costs against her from the time of the tender of judgment made by defendants on 16 December, 1913. It is not denied that the tender was made. It is recited as a fact in the judgment and is set out in the defendants' answer. The only objection made to the tender is that it was not enough. Plaintiff contended that tender should have been made upon a basis of computation *Page 442 
of interest on the policy, and likewise on the note to 16 December, 1913, instead of to 21 September, 1912. Nor is there any objection to the form of the tender. It is treated as being regular.
The policy matured 21 September, 1912. The note provided as follows: "Should the policy become payable while this note is outstanding, the amount of the note, with any additional loans and all interest thereon, shall be deducted by said society from the amount due on this policy."
The note was outstanding when the policy fell due. Defendants admitted their liability on the policy for the full amount, subject to a deduction of the amount due on this note. The date of settlement was 21 September, 1912, when the policy matured. We have upheld that contention. The defendants, therefore, were indebted to plaintiff on said date in the sum of nine hundred five and 40/100 dollars, The tender of judgment was not for nine hundred five and 40/100 dollars, payable 16 December, 1913, but the tender was for nine hundred five and 40/100 dollars, together with interest thereon at the rate of six per cent per annum from the 21st day ofSeptember, 1912, when it should have been paid, and for the costs of the action, incurred up to the date the tender was made, 16 December, 1913.
The defendants might have gone further and paid the money into court and stopped interest. They did not do that, however; and we hold that the tender was good, and that plaintiff cannot recover any costs, except such costs as had not been incurred on 16 December, 1913, the date of the tender. Certain costs not then payable were determinable before that time and were costs matured as of that date, such as rendition and enter of judgment, filing papers, etc. These costs must be paid by the defendants, notwithstanding its tender; but the other costs thereafter accruing, such as jury trial, taking of depositions, (378) etc., which would have been avoided in toto had defendant's offer been accepted, must be paid by plaintiff.
Upon a review of the record, we find
No error.